# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|                                               |     |                                      |
| --------------------------------------------- | --- | ------------------------------------ |
| **SHARON A. McDONALD,**                       | )   |                                      |
|                                               | )   |                                      |
| **Plaintiff,**                                | )   |                                      |
|                                               | )   | **Civil Action No. 2:03-0071**       |
| **v.**                                        | )   | **Judge Nixon / Knowles**            |
|                                               | )   |                                      |
| **JO ANNE BARNHART,**                         | )   |                                      |
| **Commissioner of Social Security**           | )   |                                      |
|                                               | )   |                                      |
| **Defendant.**                                | )   |                                      |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's "Motion for Judgment Based Upon the Administrative Record." Docket Entry No. 7. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 9.

For the reasons stated below, the undersigned recommends that Plaintiff's "Motion for Judgment Based Upon the Administrative Record" be DENIED, and that the decision of the Commissioner be AFFIRMED.

Case 2:03-cv-00071   Document 11   Filed 04/17/06   Page 1 of 37 PageID #: 1

## I. INTRODUCTION

Plaintiff filed her applications for DIB and SSI on July 5, 2000, alleging that she had been disabled since June 5, 1999, due to essential tremors, fibromyalgia, inability to grip objects with her hand, migraines, nerves, numbness in her hands and arms while driving, nausea, diarrhea, rheumatoid arthritis, inability to bend her left knee, and depression. Docket Entry No. 2, Attachment ("TR"), pp. 17; 90-92; 359-361. Plaintiff's applications were denied both initially (TR 65-66; 362-367),[1] and upon reconsideration (TR 67-68; 368-370).[2] Plaintiff subsequently requested (TR 77) and received (TR 78-83) a hearing. Plaintiff's hearing was conducted on July 16, 2002, by Administrative Law Judge ("ALJ"), William F. Taylor. TR 32-64. Plaintiff and vocational expert ("VE"), Rebecca Williams, appeared and testified. *Id.* Ms. Isabell McDonald, Plaintiff's mother, and Mr. Gary Medlin, Plaintiff's friend, also appeared and testified. *Id.*

On August 29, 2002, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 13-25. Specifically, the ALJ made the following findings of fact:

> 1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b)

---

[1]There is a second copy of the initial Notice at TR 69-73, TR 363-367.

[2]The DIB Notice of Reconsideration is found at TR 75-76.

and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7. The claimant has the following residual functional capacity: light work with the following limitations: moderate limitations in dealing with work place stress. Additionally, the claimant can lift/carry 20 pounds occasionally and 10 pounds frequently. She can stand/walk about 6 hours in an 8-hour workday, and had no noted limitation on sitting. Claimant's pushing and pulling ability is limited in her lower extremities. The claimant was [*sic*] can climb occasionally, balance frequently, kneel, crouch, crawl and stoop occasionally. The claimant cannot climb a rope or scaffold, but that [*sic*] she could ascend/descend stairs with a handrail. With regard to the manipulative limitations, the claimant's ability to reach, handle, finger and feel were unlimited as were her visual/communicative limitations.

8. The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

9. The claimant is a "person closely approaching advanced age" (20 CFR §§ 404.1563 and 416.963).

10. The claimant has a "high school (or high school equivalent) education" and some college classes (20 CFR §§ 404.1564 and 416.964).

11. The claimant has transferable skills from skilled work previously performed as described in the body of the decision (20 CFR §§ 404.1568 and 416.968).

12.	The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

13.	Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.15 a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as Teacher Assistant, Usher, Parking Lot Attendant, Messenger, Auditing Clerk.

14.	The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

TR 24-25.

On October 28, 2002, Plaintiff timely filed a request for review of the hearing decision. TR 11-12. On December 6, 2002, the Appeals Council issued a letter granting a 25-day extension for the receipt of additional evidence and arguments (TR 10), and ordered that certain additional evidence be made part of the record (TR 9). On May 9, 2003, the Appeals Council issued another letter declining to review the case (TR 6-8), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to essential tremors, fibromyalgia, inability to grip objects with her hand, migraines, nerves, numbness in her hands and arms while driving, nausea,

diarrhea, rheumatoid arthritis, inability to bend her left knee, and depression. TR 17.

**1. Treatment, Cookeville Emergency Room**

On November 17, 1994, Dr. Jefferson Crosier examined Plaintiff for a "several month history of recurrent epigastric right upper quadrant pain radiating to the chest with some nausea but no vomiting." TR 335. Dr. Crosier stated that "[t]here has been no changes in bowel habits nor fever, chills or other constitutional symptoms." *Id.* Plaintiff underwent an "upper endoscopy," and Dr. Crosier assessed her condition as: "[a]ntral gastritis, mild" and "[r]ight upper quadrant epigastric chest pain, rule out cholelithiasis" TR 336.

Also on November 17, 1994, Plaintiff had a "[g]astroscopy" and "[c]lot-test."[3] TR 337. On November 18, 1994, Plaintiff had a routine mammography (TR 331-332), the results of which were normal (TR 332).

On March 24, 1995, Plaintiff underwent laboratory work, which indicated Estradiol levels of 189 and Estrogen levels of 329. TR 328-330.

A "Physical Therapy Evaluation & Treatment Plan" and related laboratory work, dated March 6, 1996, detailed Plaintiff's "Functional Status." TR 324-327.[4] The "Plan" stated that "[t]he patient is unable to consecutively climb stairs with one leg after the other." TR 326. The report further stated that Plaintiff "is unable to weightbear for sustained length of time or bend the knee beyond 70 degrees for prolonged sitting, bicycling, etc." *Id.* The treatment plan included instructions for Plaintiff to exercise three times per week for four weeks. *Id.*

---

[3]The record contains a pathology report and laboratory work. TR 333; 338.

[4]TR 326 and 327 are identical records; neither copy has a date next to the physician's signature. TR 326; 327.

The record also contains routine mammographies and laboratory work from July 29, 1996 (TR 321-323), March 27, 1998 (TR 315-316), and July 26, 1999 (TR 313-314), as well as an ultrasound of Plaintiff's gallbladder and laboratory work from January 28, 1998 (TR 317-320).

On March 16, 2001, Plaintiff visited the emergency room. TR 306-312. Plaintiff's "[a]dmission complaint" included "vision loss" and "numbness to arm" (TR 306), and her "associated symptoms" included nausea and vomiting (TR 309). Plaintiff was diagnosed with a "[v]ascular headache." TR 310.

## 2. Treatment, Dr. Lauretta A. Connelly

Dr. Lauretta A. Connelly treated Plaintiff for gynecological conditions from May 24, 1999 to August 30, 1999. TR 204-211. On May 24, 1999, Dr. Connelly ordered a pelvic ultrasound and laboratory work.[5] TR 210-211. Dr. Connelly's impressions were: "[p]revious hysterectomy" and "[s]mall cyst right ovary." TR 210. Plaintiff's exam was "otherwise normal." *Id.*

A letter dated July 7, 1999, written by Dr. Connelly to Dr. Gregory Byrne, recorded Dr. Connelly's initial physical examination of Plaintiff. TR 205-206. Dr. Connelly wrote that Plaintiff had a history of ovarian cysts, and suggested that: "[t]he most likely diagnosis is that this small 1 cm cyst identified in the right ovary is follicular." TR 206. Dr. Connelly recommended another ultrasound. *Id.*

A pelvic ultrasound from July 16, 1999, revealed "a 1 cm simple and 2.6 cm hemorrhagic right ovarian cysts [*sic*] with a 2 cm simple left ovarian cyst." TR 209. On July 26, 1999,

_____

[5]Plaintiff's name was Sharon Ann Poarch at the time of this examination. TR 210-211.

6

Plaintiff underwent a routine mammography screening. TR 208. Dr. William Humphrey interpreted the results, finding: "[l]ittle change from previous study of 3/27/98." *Id.* Dr. Connelly ordered another pelvic ultrasound on August 30, 1999, finding that: "There is a 1 cm simple right ovarian cyst," that Plaintiff's "[l]eft ovary and adnexa are WNL," and that "[t]he 2.6 cm hemorrhagic right and 2 cm simple left ovarian cysts have resolved." TR 207.

**3. Treatment, Dr. Gregory Byrne**

On March 2, 2000, Dr. Gregory Byrne treated Plaintiff for "hot flashes." TR 239. Dr. Byrne's impression was "[p]robable post menopausal syndrome." *Id.* Dr. Byrne documented Plaintiff's basic health information from March 2, 2000 to June 1, 2000 on an "Adult Flow Sheet," "Problem List," and "Medication List." TR 240. The record contains laboratory work ordered by Dr. Byrne from March 3, 2000 (TR 245), March 8, 2000 (TR 246), March 17, 2000 (TR 244), and April 14, 2000 (TR 243).

On June 1, 2000, Plaintiff had a follow-up appointment with Dr. Byrne to refill her medication. TR 238. The record referenced a May 18, 2000 letter from Dr. Graham about Plaintiff's familial tremor, a May 15, 2000 letter from Dr. John about Plaintiff's fibromyalgia, and an April 19, 2000 letter from Dr. Lamar about Plaintiff's "leukopenia." *Id.* Dr. Byrne's impressions were: "[h]istory of familial tremor," "[p]ossible fibromyalgia syndrome," and "[l]eukopenia evaluation in progress likely related to the patient's rheumatological problem." *Id.* Dr. Byrne prescribed refills for Premarin and Librium. *Id.*

On August 30, 2000, Dr. Byrne conducted Plaintiff's annual breast examination. TR 237. Dr. Byrne noted that "[e]xamination is unremarkable on inspection," and that "[t]here is a 3cm diameter area in the upper outer quadrant of the left breast that is tender to palpation." *Id.*

7

Dr. Byrne's impressions were: "[p]robable mastitis in the area noted," "[p]ost menopausal syndrome," "[f]amilia [*sic*] tremor," "[c]hronic allergies," and "[m]ild leukopenia." *Id.* Dr. Byrne recommended a mammography (TR 241), laboratory work (TR 242), and a follow-up appointment after 10 days (TR 237).

**4.  Treatment, Dr. Steven Graham**

Dr. Steven Graham treated Plaintiff for tremors from May 18, 2000 to July 17, 2000, as well as from November 6, 2000 to November 14, 2001.  TR 212-222; 288-304.  A letter dated May 18, 2000, written by Dr. Graham to Dr. Byrne, recounted Dr. Graham's initial physical examination of Plaintiff.  TR 217-218.  Dr. Graham discussed Plaintiff's complaint of tremors: "[t]he tremor is noticed mostly on intentional movement, and occasionally she will notice tremor in her head."  TR 217.  A physical examination revealed that Plaintiff had "normal" pulse, blood pressure, speech, cognition, cranial nerves, motor tone, and motor power.  *Id.*  Dr. Graham noted that: "[o]n voluntary movement on [*sic*] the arms, there is a vast, low amplitude tremor of both hands more on the right than the left" and that "[n]o definite head tremor is noted."  *Id.*  Dr. Graham's impression was: "History and examination most consistent with familial, essential tremor."  *Id.*  He also noted that Plaintiff had "no other features suggestive of Parkinsonism." TR 218.  For treatment of the tremor, Dr. Graham prescribed Mysoline.  *Id.*  A nursing examination from May 18, 2000, recorded Plaintiff's medications, family history, and other conditions, including her headaches, knee surgery, and "spastic colon."  TR 219.

On June 16, 2000, Plaintiff had a follow-up appointment with Dr. Graham, who prescribed Inderal as an alternative to Mysoline because "[i]t has been difficult for her to tolerate more than 25 mg of Mysoline at bedtime."  TR 215-216.  Additionally, Dr. Graham completed

and signed a "Statement of Physician" form indicating that Plaintiff had a "chronic tremor" that left her "totally disabled" for an "[i]ndefinite" period of time. TR 222. On July 17, 2000, Dr. Graham again consulted with Plaintiff and raised her daily dosage of Inderal from "20 mg twice a day" to "40 mg twice a day."[6] TR 213-214.

**5. Mental Consultation, Dr. Linda Blazina, Ph.D.**

On August 26, 2000, Dr. Linda Blazina conducted a mental examination of Plaintiff on behalf of the Tennessee Disability Determination Services ("DDS"). TR 231. During this consultation, Plaintiff alleged disability because of tremors and fibromyalgia. *Id.* Dr. Blazina documented Plaintiff's complaints of tension and nervousness, as well as her problems with mood swings and memory. TR 232. Dr. Blazina recorded that Plaintiff had last worked as a secretary for a realty company, and that she was "laid off" in June of 1999 after having worked there for three months. *Id.* Dr. Blazina further recorded Plaintiff's account of her daily activities, her legal problems with her ex-husband, and her health problems. TR 233. Dr. Blazina's summary stated that: "[i]ntellectually, she is functioning in the average range" and that "[h]er mood was somewhat dysphoric during the evaluation." TR 234.

Dr. Blazina's diagnoses were: "Axis I: Adjustment disorder with mixed anxiety and depressed mood. Axis II: No diagnosis. Axis III: Central tremors, fibromyalgia (see medical records). Axis IV: Health problems, ongoing legal problems with ex-husband."[7] TR 234-235. Dr. Blazina also concluded:

---

[6]The record contains a copy of the prescription (TR 220), and a medication sheet (TR 221), which was referenced in other records from Dr. Graham (TR 214; 216).

[7]Dr. Blazina's "Axis V" impression is illegible. TR 235.

9

>[Plaintiff] does not demonstrate any limitations in her ability to understand and memory. Her ability to sustain concentration and persistence is likely limited due to anxiety and depressive features, which may be secondary to her medical problems. Her social interaction abilities do not appear significantly limited at this time. Her adaptation abilities do not appear significantly limited at this time.

TR 235.

## 6. Psychiatric Review Technique Form, September 15, 2000

On September 15, 2000, Plaintiff underwent a DDS mental evaluation.[8] TR 247-255. The evaluator checked "RFC Assessment Necessary" and found that Plaintiff manifested "[a]ffective [d]isorders" and "[a]nxiety [r]elated [d]isorders." TR 247. The "Reviewer's Notes" mentioned Plaintiff's "tremors and possible fibromyalgia." TR 248. Plaintiff was not found to have any of the following: organic mental disorders (TR 249); schizophrenic, paranoid, and other psychotic disorders (TR 249); mental retardation and autism (TR 251); somatoform disorders or personality disorders (TR 252); or substance addiction disorders (TR 253).

Plaintiff manifested affective disorders, which were characterized as: "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome." TR 250. In completing the description of Plaintiff's affective disorders, the evaluator marked "[a]bsent" with regard to both "[d]epressive syndrome" and "[m]anic syndrome," but checked "[o]ther" to support his finding of affective disorders.[9] *Id.* Plaintiff also manifested anxiety related disorders, specifically: "[a]nxiety as the predominant disturbance or anxiety experienced in the attempt to

---

[8]There is no name on the PRTF evaluation. TR 247-259.

[9]It is unclear exactly what the evaluator wrote in the space next to "Other." TR 250.

master symptoms." TR 251. The evaluator checked "[o]ther" as the source of his diagnosis.[10]
*Id.*

On the "Rating of Impairment Severity" form, the evaluator assessed Plaintiff under impairment listings 12.04 and 12.06. TR 254. The evaluator found that Plaintiff had a "[s]light" degree of limitation with regard to "Restriction of Activities of Daily Living" and "Difficulties in Maintaining Social Functioning," and "[o]ften" experienced "Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner (in work settings or elsewhere)." *Id.* Plaintiff was found to have "[n]ever" experienced "Episodes of Deterioration or Decompensation in Work or Work-Like Settings Which Cause the Individual to Withdraw from that Situation or to Experience Exacerbation of Signs and Symptoms (which may Include Deterioration of Adaptive Behaviors)." *Id.* Plaintiff did not have "[s]ymptoms resulting in *complete* inability to function independently outside the area of one's home." TR 255 (emphasis in original).

**7. Treatment, The Consultant Group, P.C.**

The record contains routine laboratory work from April 19, 2000 (TR 270-271; 273), as well as laboratory work and medical evaluations from May 16, 2000, when Plaintiff was tested for "Hepatitis C" (TR 269). A "Medication Record" contains a list of Plaintiff's medications from April 19, 2000, April 25, 2000, May 15, 2000, and October 23, 2000. TR 272.

Dr. Ruth E. Lamar began treating Plaintiff upon referral from Dr. Byrne after Plaintiff had manifested a "low white count confirmed on three different occasions." TR 266. On April 19, 2000, Dr. Lamar conducted a "Hematology Consultation" of Plaintiff, and diagnosed her

---

[10]It is unclear exactly what the evaluator wrote in the space next to "Other." TR 251.

with "[l]eukopenia." *Id.* Dr. Lamar noted that Plaintiff had "some livedo reticularis over her feet," and that "[h]er father had ... pancreas cancer, lung cancer, and Parkinson's." TR 267. Dr. Lamar's impression was that Plaintiff had: "leukopenia and nonspecific symptoms of fatigue, arthritis, and probably Raynaud's phenomenon," and Dr. Lamar explicitly stated: "I don't think this is depression." TR 268. Dr. Lamar's treatment plan was to "consider rheumatological referral if anything suggests a connective disorder." *Id.*

On May 15, 2000, Plaintiff had a "Rheumatologic Consultation" with Dr. J. Thomas John, and reported: "malaise, fatigue, generalized aches and pains with aching down in her hands as well as her shoulder and hip girdle areas." TR 262. Dr. John noted that "[s]he has also had what sounds Raynaud's [*sic*] disease although it is not classic," but also stated that "[t]his lady has absolute, classic fibromyalgia tender points with positive jump sign," and he noted that "the control points almost entirely are without pain." TR 263. Dr. John suggested that Plaintiff undergo therapy at Cookeville General Hospital, and he stated that he did not want to prescribe "antidepressants." TR 264. Dr. John concluded: "[s]he has a substantial disease but I think her attitude is right and I think her prognosis is potentially reasonably good considering." *Id.*

On October 23, 2000, Dr. John examined Plaintiff, finding: "she has had some nausea/diarrhea recently; her bones ache; her feet and hands get numb when they are cold, and she is aching all over." TR 261. Dr. John noted that Plaintiff indicated that she "can't afford to drive the 25 miles to physical therapy." *Id.* Dr. John asserted that Plaintiff "really has not put the amount of energy into dealing with her fibro[myalgia], which is going to be necessary for her to do if she is to get any relief at all." *Id.*

A record from December 20, 2000, indicated: "There is not much to do for a

12

fibromyalgia." TR 287. The record also noted that Plaintiff "did not get, however, good therapy, and with her outlook now, and [sic] I do not think we are going to get much help until her depression is addressed." TR 287.

On December 12, 2001, Chief Administrative Law Judge, Ronald Miller, requested medical records starting from October 24, 2000, from Dr. John and The Consultant Group. TR 282. Dr. John returned an incomplete "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form, which was filed on December 28, 2001, that had no markings except for Dr. John's signature and a note that "pt not seen since 12/00." TR 283-286.

## 8. Residual Functional Capacity Assessments

On August 8, 2000, Dr. James Lester conducted a physical Residual Functional Capacity Assessment ("RFC") of Plaintiff. TR 223-230. Plaintiff's assessment revealed no exertional limitations (TR 224), as well as no postural, visual, communicative, or environmental limitations (TR 225-227).[11] Plaintiff's assessment revealed that Plaintiff had manipulative limitations, including the ability to "frequently" perform tasks involving "handling" and "fingering." TR 226.

On September 15, 2000, Plaintiff underwent a mental RFC. TR 256-257. Plaintiff was "not significantly limited" in all areas except for the category of "sustained concentration and persistence," in which Plaintiff was "moderately limited" in her abilities to "maintain attention and concentration for extended periods"; to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; and to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to

_____

[11]The handwritten notes on the RFC form are partially illegible. TR 224-225.

perform at a consistent pace without an unreasonable number and length of rest periods."  *Id.*

On November 30, 2000, Dr. Robert E. Burr performed another physical RFC of Plaintiff. TR 274-281.  Dr. Burr opined that Plaintiff could "occasionally" lift and/or carry 20 pounds; "frequently" lift and/or carry 10 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and push and/or pull with unlimited ability, other than her limitations on lifting and carrying.  TR 275.  Dr. Burr found that Plaintiff had environmental limitations for which Plaintiff should "avoid concentrated exposure" to extreme heat, wetness, humidity, noise, vibration, and hazards, and "fumes, odors, dusts, gases, poor ventilation, etc."  TR 278.  Dr. Burr further suggested that Plaintiff "avoid even moderate exposure" to extreme cold.  *Id.*

### 9.  Treatment, Dr. Steven Graham

On November 6, 2000, Plaintiff was examined by Dr. Steven Graham for her complaint of numbness of both hands, which worsened with exertion and interfered with her sleep.  TR 301-304.  Dr. Graham observed: "[o]n exam, there is only a small amount of tremor seen in the left hand," and he noted: "[g]rip strength is within normal limits."  TR 301.  Dr. Graham found that Plaintiff showed "relatively good control of her tremor on Inderal 40 mg twice a day without significant side effects," and he prescribed a refill for that dosage of Inderal.  *Id.*

Dr. Graham conducted "Electromyography and Nerve Conduction Studies" to determine if Plaintiff had "bilateral carpal tunnel syndrome."  TR 302-303.  His impression was that Plaintiff had a "[n]ormal EMG."  TR 302.  Dr. Graham further noted that "[t]here was no definite electrical evidence of right or left median neuropathy at the level of the wrist."  *Id.*

On November 7, 2000, Dr. Graham signed a "Statement of Physician," indicating that

Plaintiff had a "mild essential tremor." TR 300. He checked "no" in response to the question: "Is patient now totally disabled for any occupation for which qualified by education, training, or experience?" *Id.*

At a May 7, 2001 follow-up appointment, Dr. Graham indicated that, "[Plaintiff] believes her essential tremor is mildly worsening." TR 298. Dr. Graham observed: "On exam, she has a mild amount of tremor noted in both hands, especially on drawing a spiral." *Id.* Dr. Graham prescribed "propranolol up to 60 mg twice a day," and gave Plaintiff samples and a prescription for "imitrex 100 mg to be used as needed for headache." TR 298-299.

On September 17, 2001, Dr. Graham noted: "[s]he continues on propranolol 60 mg twice a day, but subjectively believes her tremor is getting somewhat worse." TR 296. Dr. Graham also noted that "[s]tress and anxiety are clear aggravators." *Id.* Dr. Graham found that "Midrin" helped to alleviate Plaintiff's headache pain, and 10 mg of Librium helped with her tremor. *Id.* Dr. Graham added "clonazepam 1 mg twice a day" for Plaintiff's anxiety and tremors. *Id.*

Also on September 17, 2001, Dr. Byrne signed a referral form for Plaintiff to follow-up with Dr. Graham. TR 295. On November 14, 2001, Dr. Graham recorded that Plaintiff reported better sleep and increased control of her tremor while taking the "clonazepam," and Dr. Graham suggested that Plaintiff continue her medications. TR 293-294. Plaintiff also reported increased energy. TR 294.

**10. Consultation, Mr. Steven Hardison, M.A.**

On March 6, 2002, Mr. Steven Hardison evaluated Plaintiff on behalf of the DDS. TR 339-345. The evaluation was cosigned by Dr. William R. Sewell. TR 343. Plaintiff alleged disability because of her "nerves and depression" TR 339. The examiner noted that Plaintiff

"was somewhat irritable and seemed somewhat aggravated over participating in this evaluation, as she reported she was applying for disability based on her medical issues." *Id.* Plaintiff reported having fibromyalgia, essential tremors, low white blood count, and arthritis. TR 340. Additionally, Plaintiff discussed her divorce and family situation, her education, her previous employment, and her daily activities. TR 339-340.

Plaintiff had a "Full Scale IQ" of 78, which indicated "borderline" intelligence. TR 341. The examiner, however, opined that Plaintiff could function "within the average range." *Id.* During Plaintiff's "Mental Status Examination," she was evaluated as "alert" and "adequately oriented," but her "immediate concentration and attention skills appear[ed] somewhat limited." TR 342.

Attached to this evaluation is a "Medical Source Statement of Ability to Do Work-Related Activities" that was completed on March 4, 2002. TR 344-345. The evaluator found that Plaintiff had "slight" limitations in her abilities to "[u]nderstand and remember detailed instructions" and to "[c]arry out detailed instructions." TR 344. Plaintiff had "none to slight" limitations in her abilities to "[i]nteract appropriately with the public," "[i]nteract appropriately with supervisor(s)," "[i]nteract appropriately with coworkers," and "[r]espond appropriately to changes in a routine work setting." TR 345. Plaintiff showed "moderate" limitations in her ability to "[r]espond appropriately to work pressures in a usual work setting." *Id.*

**11. Consultation, Dr. Donita Keown**

On March 14, 2002, Dr. Donita Keown examined Plaintiff on behalf of the DDS. TR 346. Plaintiff alleged disability because of essential tremor, fibromyalgia, migraines, nausea, diarrhea, rheumatoid arthritis, problems with her left knee, and problems with her hands and

16

arms.  *Id.*  Plaintiff explained that her tremor had worsened over the last three years, and that she

could not increase her dosage of Inderal to help alleviate the condition because of its effect on

her blood pressure.  *Id.*  At the time of the evaluation, Plaintiff was scheduled to have a

"coloscopy [*sic*]."  TR 347.

When asked why she stopped working, Plaintiff explained that "she just has

overwhelming fatigue and flu like symptoms, generalized feeling of weakness, and just 'feels

bad all the time.'"  TR 347.  Dr. Keown noted Plaintiff's report that "[s]he has diarrhea and

aching, and sometimes has a low grade fever approximately 100 degrees."  *Id.*  Upon physical

examination, Plaintiff had no limitations except for her left knee, which was "enlarged," would

extend to "0 degrees," and would flex to "at least 120 degrees."  TR 348-349.  Plaintiff would

not let the examiner "percuss the left knee" or "handle the lower left extremity or force the joint

in any manner."  TR 349.  Plaintiff did not reveal any tremor until she moved her neck and

"showed full rotation," after which she experienced "mild tremor of the head."  *Id.*

Attached to this evaluation was a "Medical Source Statement of Ability to Do Work-

Related Activities (Physical)," that was completed on March 13, 2002.  TR 350.  Dr. Keown

indicated that Plaintiff had no manipulative, visual, communicative, or environmental

limitations.  TR 352-353.  Dr. Keown opined that Plaintiff could occasionally lift and/or carry 20

pounds, frequently lift and/or carry 10 pounds, and stand and/or walk for about six hours in an

eight-hour workday.  TR 350.  While Plaintiff's ability to sit was not limited, her ability to push

and/or pull was "limited in lower extremities."  TR 351.  Dr. Keown indicated that Plaintiff

could frequently balance, and occasionally kneel, crouch, crawl, or stoop.  *Id.*  Additionally, Dr.

Keown found that Plaintiff could occasionally climb, but clarified that she could not climb a rope

17

or scaffolding, but could ascend/descend stairs with a handrail. *Id.*

## 12. Treatment, Dr. Scott A. Copeland

Dr. Scott A. Copeland treated Plaintiff for her abdominal problems upon referral from Dr. Byrne. TR 354. On April 15, 2002, Dr. Copeland recorded that he performed a barium enema and colonoscopy on Plaintiff, which revealed a "very tight stricture." *Id.* Dr. Copeland recommended a "sigmoid colectomy" (TR 355), which he performed on April 23, 2002 (TR 356-358).[12]

## 13. Letter from Dr. Gregory L. Byrne

On December 18, 2002, Dr. Gregory Byrne composed a letter stating that he believed that Plaintiff "could never maintain gainful employment."[13] TR 371. He stated that he had treated Plaintiff for nine years, and asserted: "From a medical point of view, I feel more than simply confident that I know her better than anyone anywhere." *Id.* Dr. Byrne listed Plaintiff's conditions as leukopenia, fibromyalgia, familial essential tremor, colon resection secondary to endometriosis, anxiety, and depression. *Id.*

## B. Plaintiff's Testimony

Plaintiff was born on March 18, 1951, has a high school education, and has taken college courses. TR 40. Plaintiff was "fully apprised of the right to representation," but chose to have her hearing without counsel. TR 16. During the hearing and prior to Plaintiff's testimony, the

---

[12]The record does not contain any additional documents concerning Plaintiff's gastrointestinal condition or surgery, and the "List of Exhibits" indicates that the record does not contain an April 2, 2002 record from Dr. Ron E. Pruitt, from Nashville Gastrointestinal Specialists, Inc. (TR 3), and that this record is not "available for inclusion" (TR 2).

[13]There is no specific recipient named in the letter; instead, the letter is addressed, "To Whom it May Concern." TR 371.

18

ALJ discussed the applicable law at length, and affirmed that Plaintiff had signed a waiver of her right to representation.  TR 34-39.

Plaintiff testified that she could read and write English, and that she could add and subtract.  TR 40.  She reported that she had a driver's license, but that she drove "[s]ome.  Not a lot."  *Id.*  Additionally, she denied smoking or taking any "street drugs," and stated that she had "an occasional glass of wine maybe once or twice a week."  TR 41.

Plaintiff testified that she had worked for a real estate company in Georgia, as either an assistant manager or a manager, for seven or eight years.  TR 42.  Plaintiff stated that she began working as a paralegal or legal assistant after moving from Georgia to Tennessee.  *Id.*  Plaintiff asserted that she had a paralegal degree "for years" before she worked as a paralegal at the District Attorney's office for three years, at "Michael Nolton's [phonetic] office," with "Judge Cassidy," and at "Jerry Jerry's [sic] office, attorney."  TR 42-43.

Plaintiff testified that she was last employed in June of 1999, as a secretary for Remax Real Estate.  TR 41.  She stated that she had started working at Remax in March or April of 1999 after leaving her paralegal job with the judge and attorneys (TR 43), but that she was "laid off" from Remax in June 1999 (TR 41).  Additionally, Plaintiff worked in a convenience store for a year as a cashier, and did not do any "stocking."  TR 42.

Plaintiff testified at the hearing that "Dr. Gurnt" was her "present" doctor.  TR 44.  Presumably, Plaintiff was referring to Dr. Gregory Byrne, who was her primary physician.  Dr. Byrne had also referred her to other physicians.  *Id.*  Plaintiff stated that Dr. Lamar had treated her for "lucopena [*sic*]," that Dr. John had treated her for fibromyalgia, and that Dr. Graham had treated her for "central tremor or familiar [*sic*] tremor."  TR 45.  Plaintiff reported that, at the

19

time of the hearing, she had not seen Dr. Graham for three months, and that she had received a letter from Dr. Graham's office indicating that her insurance would no longer cover her treatment with him. TR 46. Plaintiff testified that it had been three months, "at the most," since she saw Dr. Lamar and Dr. John. *Id.* Plaintiff stated that she had appointments with Dr. Byrne's office every three months. *Id.*

Plaintiff testified that she had a list of medications that was current as of April 15, 2002. TR 47. The ALJ admitted this document into evidence as Exhibit 21E. TR 47; 202-203.

The ALJ asked Plaintiff why she thought that she could not work, and Plaintiff first responded: "I have diarrhea extremely bad. I mean, I'm talking about as much as 12 times a day. And the doctor told me that this may go on indefinitely." TR 47-48. Plaintiff also cited her inability to write, and her "shaking," which started "[s]everal years ago." TR 48. Plaintiff testified that her grandmother had Parkinson's disease, and that her father was suspected of having Parkinson's disease, but that her testing with Dr. Graham revealed that she had "central tremors" instead of Parkinson's disease. *Id.*

Additionally, Plaintiff testified that she had "lucopena [*sic*]," which she characterized as "a low white blood count." TR 48. She asserted that this condition had made it difficult for her to heal following her colon surgery. *Id.* Plaintiff also testified that she had fibromyalgia, which caused her to "ache all over." TR 49. She stated that she had elected to have "Lasik surgery," but that the physician would not operate on her because "with fibromyalgia there's no guarantee the outcome of it [*sic*]." *Id.* In addition to her "lucopena [*sic*]," "fibromyalgia," and colon problem, Plaintiff testified that she could not lift over 15 pounds. TR 50. Plaintiff further stated that she could not "strain" or "pull at anything." *Id.* Plaintiff reported: "I basically can't do

20

anything right now." *Id.* Plaintiff testified about her left knee injury, which she sustained when she fell on her knee and "dislocated [her] kneecap and crushed it." *Id.* She stated that she had had surgery on her knee, asserting: "[t]hey kept me in a cast for about a year and when I came out of the cast I couldn't bend it." TR 50. Plaintiff testified that she could not squat or "get down on [her] knees at all." TR 51. She stated that she could not sit or stand for more than half an hour (TR 51-52), could not walk for more than 30 or 45 minutes (TR 52), and could not reach or pull because "it strains [her] intestine and [her] incision" (TR 53).

Plaintiff testified: "Dr. Graham told me that I'd never be able to work again." TR 53. Plaintiff asserted that Dr. Graham also told her that she would "get worse and worse." *Id.* Plaintiff described the various medications that she had used to control her symptoms, but indicated that her medication therapy was limited because of the negative effect on her blood pressure. TR 54. Plaintiff also discussed her difficulty in daily activities because of her tremors. *Id.*

### C. Testimony of Plaintiff's Mother

Plaintiff's mother, Ms. Isabell McDonald, appeared and testified at Plaintiff's hearing. TR 55. Ms. McDonald testified that Plaintiff had a "real bad shaking problem," fibromyalgia, "real bad headaches," and knee problems. *Id.* Additionally, Ms. McDonald testified that Plaintiff had cats and dogs, and that Plaintiff tried to perform activities "around the house as much as she can." TR 56. Ms. McDonald discussed how Plaintiff's diarrhea interfered with her daily life. *Id.* Ms. McDonald added that Plaintiff had worked since high school, and that she thought that Plaintiff would still work if she were able to work. *Id.*

21

### D.  Testimony of Plaintiff's Friend

Plaintiff's friend, Mr. Gary Medlin, appeared and testified at the hearing.  TR 56.  Mr. Medlin stated that he had known Plaintiff since high school, but indicated that they had been "going together" since August 1998.  TR 57.  Mr. Medlin stated that Plaintiff "has had diarrhea really bad," and that she could not "do chores around the farm."  *Id.*  Additionally, Mr. Medlin testified that Plaintiff had tremors and was "real nervous a lot it seems like [*sic*]."  *Id.*  Mr. Medlin described Plaintiff's attempt to get "Lasik surgery," asserting that he had planned to pay for the June 22, 1999 procedure, but that the doctor ultimately would not perform the procedure because of Plaintiff's fibromyalgia.  TR 57-58.

### E.  Vocational Testimony

Vocational expert ("VE"), Rebecca Williams, also testified at Plaintiff's hearing.  TR 59-63.  The VE described Plaintiff's past relevant work, characterizing her real estate broker position as "light" and "skilled" (TR 59), her receptionist and secretary positions as "sedentary" and "semi-skilled" (TR 59), and her legal assistant or paralegal positions as "light" and "skilled" (TR 59).

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff, and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had performed in the past.  TR 60.  Specifically, the ALJ asked the VE to assume that the hypothetical claimant was 48 to 51 years old, had a high school education with some college courses, had completed and utilized of paralegal training, could read and write English, could add and subtract, had a driver's license, and had the same past relevant work experience as Plaintiff.  *Id.*  The ALJ then placed "slight" limitations on the hypothetical claimant's abilities

22

"to understand, remember and carry out detailed job instructions," "to interact appropriately with the public and to deal with supervisors and to interact with co-workers," and "to respond appropriately to changes in the workplace setting." *Id.* The ALJ asked the VE to also assume a "moderate limitation with regard to responding to workplace pressure." *Id.* The VE responded that the hypothetical claimant would not be able to perform the work of a paralegal, real estate broker, secretary, or receptionist. *Id.*

The VE stated, however, that other jobs would be available for the hypothetical claimant. TR 61. Before the VE could estimate the number and type of positions available for the hypothetical claimant, the ALJ imposed further restrictions. *Id.* The ALJ posited:

> I want you to assume this person along with the mental health restrictions that I just named would be able to occasionally lift 20 pounds, frequently lift 10 pounds. Could stand and walk or stand and, or walk [*sic*] for six hours in an eight-hour day. There would be no limitation with regard to sitting. And that she should not have any position, which would require her to routinely push and pull with her arms and legs or use her feet, legs [INAUDIBLE]. Assume that she can frequently bend, occasionally climb, occasionally kneel, crouch, crawl and stoop. And that she can reach in all directions including overhead. That she can perform both gross and fine manipulation with her hands and fingers. And that there are no limitations with regard to seeing, hearing or speaking. And there are no environmental restrictions.

*Id.* The VE opined that in the State of Tennessee, there were approximately 1,500 teacher's assistant positions, 400 usher positions, 700 parking lot attendants positions, 2,000 messenger positions at the "light level" of exertion, and 1,000 auditing clerk positions at the "light level" of exertion, all of which would be appropriate for the hypothetical claimant. *Id.* In addition to these positions, the VE testified that there were numerous other positions that would be appropriate for the hypothetical claimant, including 8,000 "sedentary" positions. *Id.*

Next, the ALJ imposed the following further limitations:

> [T]his person would be able to sit for no more than one hour at a time, stand for no more than 30 minutes at a time. Would not be able to sit, stand in combination for a full workday. Would be restricted to an occasionally [*sic*] lifting of 15 pounds with no lifting on a frequent basis. Walking approximately a half-hour during an eight-hour day. Would be able to bend but not kneel, squat, crawl. Had no problems with either fine or gross manipulation of objects with her hands and fingers.

TR 62. The VE responded that such a claimant would not be able to perform any of the aforementioned positions, nor could such a claimant perform any full-time position in Tennessee. TR 63.

The ALJ also asked the VE to reassess the hypothetical if Plaintiff's testimony were given "full credit." TR 63. The VE responded that such a person would not be able to perform any full-time work. *Id.*

### III. CONCLUSIONS OF LAW

### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."

24

*Bell v. Commissioner,* 105 F.3d 244, 245 (6ᵗʰ Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6ᵗʰ Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6ᵗʰ Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6ᵗʰ Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6ᵗʰ Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6ᵗʰ Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6ᵗʰ Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy

25

in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[14] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

_____

[14]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred by failing to accord her testimony full credibility, by finding that there were a significant number of jobs in the economy that she could perform, and by not accepting the VE's response to the second hypothetical posed which found that there would be no available positions for that hypothetical claimant.  Docket Entry No. 8.  Plaintiff also contends that the Appeals Council erred by failing to give controlling weight to Dr. Byrne's "supplemental medical opinion" that Plaintiff "could never maintain gainful employment" as expressed in his December 18, 2002 letter.  *Id.*  Accordingly, Plaintiff maintains that, pursuant to

42 U.S.C. § 405(g), the Commissioner's decision should be reversed or remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying,
> or reversing the decision of the Commissioner of Social Security,
> with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Plaintiff's Credibility

Plaintiff contends that the ALJ erred by not according full credibility to her testimony. Docket Entry No. 8. The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the

28

claimant's testimony, the claimant's daily activities, and other evidence.  *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)).  If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

In the case at bar, the ALJ determined that Plaintiff's testimony was "not fully consistent with the medical evidence."  TR 22.  Specifically, the ALJ stated:

> The claimant's allegation of inability to work due to familia [*sic*] essential tremor, fibromyalgia and mild leukopenia are not fully consistent with the medical evidence.  The medical evidence affirmatively contradicts the claimant's allegations regarding the level of limitations she has, particularly Exhibits 13F and 14F.[15] The undersigned has considered all of the evidence, including the testimony obtained at the hearing.  The undersigned finds that the claimant's subjective complaints are not fully credible based on the clinical and medical evidence and claimant's own inconsistent statements.

TR 22 (footnote added).

The ALJ observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned decision.  He has articulated the basis for discounting Plaintiff's credibility; his findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper.  Therefore, this claim fails.

**2.  Existence of Significant Numbers of Jobs**

Plaintiff also contends that, because she lives in a "very rural county in Middle

-------

[15] Exhibits 13F and 14F are found in the record at TR 339-353.

Tennessee," the positions the VE designated as appropriate for the hypothetical claimant are actually unavailable to her unless she relocates, and therefore, that a significant number of jobs actually does not exist. Docket Entry No. 8. Plaintiff's argument in unavailing. As the Sixth Circuit has held, a claimant's choice to live in a rural area, away from available jobs, does not render the appropriate positions unavailable. *See Harmon v. Apfel*, 168 F.3d 289 (6th Cir. 1999).

Furthermore, whether a significant number of jobs exists is based on many factors, and all relevant factors should be considered by the court. *See Hall v. Bowen,* 837 F.2d 272, 274-275 (6th Cir. 1988). The *Hall* Court enumerated six factors that should be considered: 1) the level of the claimant's disability; 2) the reliability of the vocational expert's testimony; 3) the reliability of the claimant's testimony; 4) the distance the claimant is capable of traveling; 5) the isolated nature of the jobs; and 6) the types and availability of such work. *Hall*, 837 F.2d at 274-275. In *Harmon v. Apfel*, *supra*, the court clarified its holdings in *Hall*, and held that the six factors identified in *Hall* were "suggestions only -- the ALJ need not explicitly consider each factor." 168 F.3d 289, 292 (6th Cir. 1999).

While the ALJ is not required to explicitly consider the six factors enumerated in *Hall*, the ALJ, in the case at bar, considered at least four of the enumerated factors. In his opinion, the ALJ cited and discussed numerous medical records to reach a conclusion about Plaintiff's RFC (TR 18-22), accredited the VE's testimony (TR 23), explained that he did not fully accredit Plaintiff's alleged level of impairment (TR 22), and outlined the types of positions appropriate for Plaintiff (TR 23). In addition to these factors, the ALJ's decision detailed Plaintiff's account of her daily activities, such as driving, as well as her daily approach to medication and treatment. TR 20-21. The ALJ properly considered many relevant factors in determining whether a

30

significant number of jobs existed that were appropriate for Plaintiff.  Accordingly, Plaintiff's argument fails.

### 3.  Hypothetical Posed to the VE

Plaintiff notes that the ALJ posed two hypotheticals to the VE which elicited two "diametrically opposed" responses.  Docket Entry No. 8.  Plaintiff essentially argues that the ALJ should have accepted the VE's answer that the claimant in the second hypothetical posited would be unable to maintain any gainful employment.  *Id.*

Plaintiff acknowledges: "The first hypothetical posited a worker with mental and physical limitations identical to the Plaintiff as reflected in her FRC [*sic*] evaluations."[16]  *Id.*  The VE opined that that hypothetical claimant would not be disabled within the meaning of the Social Security Act and Regulations.  TR 60-62.

The ALJ's second hypothetical incorporated the limitations alleged by Plaintiff in her testimony.  *See* TR 62-63.  The ALJ asked the VE:

> If I were to give full credit to the testimony of the Claimant, Ms. McDonald and tell you that the individual I have described has the same limitations as those reflected in her testimony would that person be able to perform any full-time work?

TR 63.  The VE responded, "No."  *Id.*

When a hypothetical accurately represents Plaintiff's exertional and nonexertional limitations, the ALJ may rely upon the VE's answer to the hypothetical question to prove the existence of a significant number of jobs in the national economy that Plaintiff could perform.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary*, 823 F.2d 922,

---

[16] The hypothetical is contained in the record at TR 60-62.

927-928 (6th Cir. 1987); and *Varley,* 820 F.2d at 779.

The ALJ's hypotheticals in the case at bar incorporated Plaintiff's nonexertional limitations, as well as her age, education, work experience, residual functional capacity for "light" work, postural limitations, and manipulative limitations. *See* TR 60-63. The ALJ's hypotheticals, therefore, accurately represented Plaintiff's limitations, both exertional and nonexertional. As such, the ALJ could rely upon the VE's answers to determine that a significant number of jobs exist that Plaintiff could perform.

Moreover, a hypothetical question posed to a VE need not include consideration of a claimant's subjective complaints if the ALJ finds, based upon substantial evidence, that those complaints are not credible. *Cline v. Shalala,* 96 F.3d 146, 150 (1996); *Stanley v. Secretary of H.H.S.,* 39 F.3d 115, 118-119 (1994); *Blacha v. Secretary of H.H.S.*, 927 F.2d 228, 231 (1990). As has been discussed above, after considering the record as a whole, the ALJ properly decided not to accord Plaintiff's testimony full credibility. Accordingly, the ALJ is not bound by the VE's answer to the second hypothetical, and Plaintiff's claim fails..

**4. Weight Accorded to Dr. Byrne's December 18, 2002 Letter**

**a. New and Material Evidence**

Plaintiff also argues that the Appeals Council erred in failing to give controlling weight to Dr. Byrne's December 18, 2002 letter. Docket Entry No. 8. As an initial matter, the Court notes that the ALJ's decision was dated August 29, 2002 (TR 25), nearly four months prior to Dr. Byrne's December 18, 2002 letter (TR 371). Accordingly, Dr. Byrne's letter was not in existence at the time of Plaintiff's hearing or at the time that the ALJ rendered his decision.

Plaintiff essentially argues that Dr. Byrne's December 2002 letter constitutes new and

Case 2:03-cv-00071   Document 11   Filed 04/17/06   Page 32 of 37 PageID #: 32

material evidence, and that the Appeals Council must review the ALJ's decision when new and material evidence is submitted. Docket Entry No. 8. While Plaintiff does not explicitly seek a remand pursuant to Sentence Six of 42 U.S.C. § 405(g), Plaintiff essentially argues that a remand is warranted to consider the new evidence submitted to the Appeals Council. *Id.*

As a procedural matter, on October 28, 2002, Plaintiff's counsel requested an additional 30 days to gather information from Dr. Byrne (TR 12), and on December 6, 2002, the Appeals Council issued a letter granting 25 days for Plaintiff to produce any new and material evidence (TR 10). Plaintiff's "new" evidence included two letters, one dated December 18, 2002, from Dr. Byrne, and one dated December 24, 2002, from Plaintiff's attorney, David H. Hornik. TR 371-372. Plaintiff submitted both documents to the Appeals Council, and they were subsequently made part of the record by a May 9, 2003 Order. TR 5-9.

The regulations provide that where new and material evidence is submitted with the request for review, the entire record will be evaluated and review granted where the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence. 20 C.F.R. § 416.1470.

After reviewing the December 2002 letter from Dr. Byrne, and the record as a whole, the Appeals Council determined that there was no basis under the regulations for granting Plaintiff's review. TR 6-8. The Appeals Council explicitly stated that it had "considered the additional evidence listed on the enclosed Order of Appeals Council," but "found no reason under our rules to review the Administrative Law Judge's decision." TR 6.

Remand for consideration of new and material evidence is appropriate only when the claimant shows that: (1) new material evidence is available; *and* (2) there is good cause for the

failure to incorporate such evidence into the prior proceeding. *Willis v. Secretary*, 727 F.2d 551, 554 (6th Cir. 1984). Plaintiff can show neither.

First, Plaintiff can not establish that Dr. Byrne's December 2002 letter is material. "In order for the claimant to satisfy her burden of proof as to materiality, she must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988) (*citing Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)). Plaintiff has failed to satisfy this burden.

The "new" evidence from Dr. Byrne consists of a handwritten letter that stated his nine-year treatment relationship with Plaintiff, listed Plaintiff's diagnoses, and conclusorily stated that Plaintiff "could never maintain gainful employment." TR 371. Significantly, Dr. Byrne's letter does not include new test results or medical records, and thus there is no evidence to suggest that the ALJ "would have reached a different disposition" if presented with Dr. Byrne's letter.

After reviewing the medical records before him and observing Plaintiff at her hearing, the ALJ did not find Plaintiff's allegations fully credible, and thus found that Plaintiff was not disabled. TR 23-24. In reaching his decision, the ALJ specifically referred to records from Drs. Graham, Blazina, Lamar, and Byrne (TR 19), Dr. John (TR 20), and Dr. Gerndt (TR 22), as well as the DDS evaluations (TR 20-21), the VE's opinion (TR 23), and Plaintiff's own testimony (TR 20-21). The record in the case at bar is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ when he reached his decision. The ALJ's decision also demonstrates that he carefully considered the testimony of Plaintiff, the VE, Plaintiff's mother, and Plaintiff's friend; he observed Plaintiff

during her hearing; he assessed the medical records; and he reached a reasoned decision.

Moreover, the Appeals Council reviewed Dr. Byrne's December 2002 letter, as well as the record as a whole, and expressly determined that the information contained in the December 2002 letter did not warrant changing the ALJ's decision. TR 6. Thus, as has been discussed, there is no "reasonable probability that the Secretary would have reached a different disposition of the disability claim" if the December 2002 letter had been part of the record before the ALJ.

Secondly, even if Dr. Byrne's December 2002 letter had contained new information or new evidence of Plaintiff's disability, Plaintiff has not established "good cause" for failing to submit that letter to the ALJ during the hearing. In an October 28, 2002 letter to the Appeals Council requesting an extension of time, Plaintiff's counsel argued that it had been difficult to obtain a written report from Dr. Byrne because Dr. Byrne's office has a "very busy rural medical practice and [has] not had time to get the report generated." TR 12; Docket Entry No. 8. Given the volume of other medical records that were gathered in time for the hearing, including records from Dr. Byrne's office, there is no "good cause" for failure to procure a single, handwritten letter in time for the hearing. Two years passed between Plaintiff's disability filing on July 5, 2000 (TR 90-92), and her hearing on July 16, 2002 (TR 32). Furthermore, Plaintiff visited Dr. Byrne's office on August 30, 2000. TR 237.

Plaintiff has failed to demonstrate either that Dr. Byrne's December 18, 2002 letter was material or that there was good cause for her failure to present the "evidence" at the administrative hearing. Accordingly, remand pursuant to Sentence Six of 42 U.S.C. § 405(g) is not warranted.

**b.  Weight to a Treating Physician's Opinion**

Plaintiff additionally argues that the Appeals Council erred in failing to give controlling weight to the opinion of Plaintiff's treating physician, Dr. Byrne, as expressed in his December 18, 2002 letter, discussed above.  Docket Entry No. 8.  As an initial matter, neither the ALJ nor the Appeals Council is bound by conclusory statements of a treating physician that a claimant is disabled; the definition of disability requires consideration of both medical and vocational factors.  *See, e.g., King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988).

In Dr. Byrne's December 2002 letter, he conclusorily states, Plaintiff "is disable[d] to the point that she could never maintain gainful employment."  TR 371-372.  As has been discussed above, however, Dr. Byrne did not submit any medical records or test results with his handwritten letter to support his statement.

Moreover, while Dr. Byrne treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to his opinion than to other opinions, Dr. Byrne's opinion contradicts other substantial evidence in the record.  As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2).  Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence.  *Id.*  In the case at bar, the ALJ chose to credit the evaluations of Drs. Keown and Hardison over other evidence in the record.  TR 22.  This is within the ALJ's province.  As such, the Regulations do not mandate that the ALJ accord Dr. Byrne's opinions controlling weight.  Accordingly, Plaintiff's argument fails.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

 

 

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

37